# Neill, Appellant, *v.* Shamburg et al.

| 158   263|
|e207  ²425|

*Sale of oil lease—Inadequacy of price—Equity.*

A bill in equity to set aside the sale of an oil lease on the ground of inadequacy of price will not be sustained, where it appears that at the time of the sale the land was not developed, and the greater number of witnesses as well as the weight of their testimony showed that the lease was worth nothing beyond the royalty, and the consideration was therefore sufficient.

*Fraud—Concealment of facts—Sale.*

A person about to purchase an oil lease is not bound to disclose to his vendor facts in regard to the production of oil upon a neighboring leasehold which he owns, and the failure to disclose such facts is not fraud. Unless exceptional circumstances create a duty to speak, it is the right of every man to keep his business to himself.

*Partnership—Tenants in common—Presumption.*

No presumption of partnership arises from the operation of an oil well by tenants in common.

*Tenants in common—Mortgage—Confidential relationship.*

A tenant in common mortgaged his interest to his cotenant to indemnify him against a contingent loss by having to pay a guaranty to third persons. After the mortgage was executed the mortgagor sold and conveyed the mortgaged premises to the mortgagee. *Held,* that there was no such confidential relation between the parties as required the mortgagee to disclose to the mortgagor the facts concerning the production of oil on a neighboring leasehold owned by the mortgagee.

Argued Oct. 19, 1893. Appeal, No. 99, Oct. T., 1893, by plaintiff, Elizabeth P. Neill, from decree of C. P. Forest Co., May T., 1893, No. 1, dismissing bill in equity against B. F. and H. W. Shamburg, administrators of G. Shamburg, deceased. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Bill for reconveyance of oil lease. Before NOYES, P. J.

The case was referred to J. H. Donly, Esq., as master, who reported as follows:

" 1. On June 11, 1877, John Wilson and Jane Neill, owners of the fee, demised and let to G. Shamburg, defendants' intestate, for oil mining purposes, and in consideration of reserved royalties, fifty acres of land ' more or less,' being the western part of lots 10, 11 and 12, of the Manross farm in Harmony township, Forest county, Pa., the term being twenty years from date of

the lease. On this lease said G. Shamburg drilled oil wells, numbered respectively 5, 6 and 7. The latter, No. 7, was a good producing oil well, which produced, at one time, fifty or sixty barrels per day.

"2. On March 25, 1878, the said owners of the fee demised and let to said G. Shamburg for the like term and purposes, and in consideration of reserved royalties, the remaining parts of said lots 10, 11 and 12 (not covered by the lease referred to in the 1st finding), and the whole of lot No. 9, which lies immediately south of, and contiguous to, lot No. 10. Also lot No. 8, which lies immediately east of, and contiguous to, said lots 9 and 10. The whole containing two hundred acres, more or less, of the Manross farm, aforesaid.

"3. On April 18, 1878, said G. Shamburg assigned and conveyed to Elizabeth P. Neill, the plaintiff, the undivided one half of the leasehold of two hundred acres covered by the 2d finding.

"4. On July 29, 1879, said Elizabeth P. Neill sold and conveyed back to G. Shamburg the undivided half referred to in 3d finding. The consideration being $550, paid to her by said Shamburg, 'and one hundred dollars additional (to be paid) when a well is found on said lease producing six bbls. per day for any thirty days during the first six months after it is finished.'

"5. During the plaintiff's ownership of the undivided one half referred to in 3d finding, said G. Shamburg instructed his employees, or some of them, not to let anybody know anything about his business; so that it was impossible for J. A. Neill, plaintiff's husband, who was acting for her, to obtain accurate information as to the production of the wells on the fifty acre lease referred to in 1st finding, except from said G. Shamburg in person. The oil from this lease was run into receiving tanks outside the Manross farm, and blended with other oil of G. Shamburg before being run into the public (or quasi public) pipe lines.

"6. A leasehold of 'two hundred acres of the Manross farm, in the locality of well No. 7' (referred to in 1st finding), subject to the royalties reserved in the leases referred to in 1st and 2d findings, was worth in July, 1879, about $20,000.

"7. The value of the leasehold described in the second finding, or of plaintiff's undivided one half thereof, referred to in the third finding, nowhere appears in the evidence. Said lease-

hold, so far as shown by the evidence, was, on July 29, 1879, undeveloped. The value ascertained in the sixth finding was of 'two hundred acres in the locality of well No. 7,' which was on the fifty acre piece, in which plaintiff had no interest. And the evidence of value was based upon the actual production of well No. 7 and other wells.

## "CONCLUSIONS OF LAW.

" Plaintiff prays for a decree canceling her conveyance back to G. Shamburg, of July 29, 1879, referred to in the 4th finding, and directing defendants to reconvey the property to her, upon the alleged ground that her said conveyance to G. Shamburg was obtained by the latter by misrepresentation and fraud, and for account of profits, etc.

" Fraud must be proved. But when facts are proved from which a legal presumption of fraud results, then fraud is proved.

" The plaintiff's solicitor contends, (*a*) that the consideration referred to in the 4th finding, $550, and one hundred additional when a well is found on said lease producing six bbls. per day for any thirty days during the first six months after it is finished,' was a practical representation that no such well 'on said lease' had then been found. In this the master concurs. But there is no evidence that this 'practical representation' was not true. While a well of greater capacity did exist on the fifty acre lease described in 1st finding, there is no satisfactory evidence that any such well existed on the two hundred acre lease described in 2d finding.

" The plaintiff's solicitor contends: (*b*) That defendants' intestate stood in confidential relationship to plaintiff when he purchased her half of the two hundred acre leasehold. 1st. The relationship of a tenant in common with her. 2d. That of partner with her in developing the same. It does not appear that G. Shamburg and plaintiff ever sustained to each other the partnership relationship, inasmuch as no agreement to develop their common property is shown to have been made between them. By the second, third and fourth findings, it appears that from the 18th of April, 1878, until the 29th of July, 1879, one year, three months and eleven days, plaintiff and G. Shamburg were tenants in common of the two hundred acre lease referred to in the 2d finding. The relationship of tenancy in common is, in a limited degree, a confidential relationship. One

tenant in common cannot purchase an incumbrance or out-standing title and set it up to defeat the titles of his cotenants in common : Weaver v. Wible, 25 Pa. 270. It is, however, a less confidential relationship than that which exists between partners. Where one partner, familiar with the value of his partner's interest, purchases the same at an inadequate price, the vending partner having less opportunity of knowing its value, the onus is on the vendee to show that the transaction was free from fraud or undue influence. But plaintiff cannot in the present case invoke the aid of this principle, because (*c*) she and G. Shamburg are not shown to have been partners. For one year, three months and eleven days, they owned the two hundred acre leasehold as tenants in common, and if during that time they had joined in drilling oil wells thereon at their common expense they would, thereby, have become partners. But the evidence fails to show this.

" (*d*) It is not shown that the purchase by G. Shamburg of plaintiff's interest was at an inadequate price. There being no evidence of the value of the two hundred acre leasehold (or of plaintiff's interest in it), as distinct and separate from the fifty acre lease (in which plaintiff had no interest). All the evidence of value being predicated of a two hundred acre lease-hold in the locality of well No. 7. The witnesses in their estimates appearing to base them upon the production of well No. 7 and other wells, on the fifty acre leasehold. So far as shown the two hundred acre leasehold, at the time of the sale of it by plaintiff to G. Shamburg, was undeveloped, and may have been of no greater value than the latter paid for it.

" The conveyance plaintiff prays to have canceled was made on the 29th day of July, 1879, and her bill was filed to No. 1, Sept. T., 1891, about twelve years afterward, and after the death of G. Shamburg. The defendants have pleaded the statute of limitations. To this the plaintiff's solicitor makes two answers : 1st. That the statute only begins to run from discovery of the fraud. If any fraud had been practiced it seems to the master it might have been discovered in the summer of 1880, eleven years before the suit was brought. The only thing tending to show fraud is what appears in the 5th finding as to G. Shamburg's instructions to his employees not to disclose the production of the wells. And although these wells were on ar

adjoining leasehold, in which plaintiff had no interest, still she had a right to know their production, as it materially affected the value of the adjoining lease.  Such attempt at keeping secret the production, in the master's opinion, falls far short of establishing fraud.  But, if it did, the discovery of the production, it seems to the master, might with reasonable diligence have been made at any time after the 1st of March, 1880, when Benjamin W. James left the employ of G. Shamburg.  After leaving the employment, it does not appear that he was under any bann of silence, or that he would not, if inquired of, have fully informed plaintiff.

" To the statute plaintiff's solicitor replies, 2d, that, during all the time, plaintiff was covert, and the statute could not be invoked against her.  However this may be, the master is of opinion, that, as plaintiff is seeking to annul an executed contract, this long delay ought to cause a chancellor to hesitate before recommending a decree in her favor.

" Again, it does not appear in the bill, or elsewhere, that plaintiff ever offered to restore to G. Shamburg, or his estate, the $550 she received from him for her interest.  It may be suggested that this may be done on an account of the production.  But the evidence does not show that there ever was a production from the two hundred acre lease adequate for this purpose.  It may be that if plaintiff had offered back the money, with interest, that defendants would have been only too glad to restore to her the property.  The master recommends a decree that plaintiff's bill be dismissed at her costs."

On exceptions the master reported an additional finding of fact, which was as follows :

" 8. On the 4th day of April, A. D. 1879, plaintiff and her husband assigned to G. Shamburg the two hundred acre leasehold (and another leasehold not connected with this contention), and on same day said Shamburg executed to them a separate defeasance, showing that this assignment to him was a mortgage to secure said Shamburg on account of his having guaranteed a security held by third persons against plaintiff and her husband for $5,000.  On payment of which Shamburg was to reconvey to plaintiff."

Exceptions to the master's report were overruled, and a decree entered dismissing the bill.  Plaintiff appealed.

*Errors assigned* were dismissal of exceptions, and dismissing bill, quoting the substance only of the exceptions.

*Samuel T. Neill, T. F. Richey* with him, for appellant.—By reason of the relations existing between plaintiff and Dr. Shamburg, his purchase of plaintiff's interest in their joint leasehold without disclosing to her all the facts affecting its value was such a legal fraud upon her rights as rendered the transaction void: Lloyd v. Lynch, 28 Pa. 419; Keller v. Auble, 58 Pa. 410; Duff v. Wilson, 72 Pa. 442; Edmunds's Ap., 68 Pa. 24; Weible's Ap., 127 Pa. 34; Davis v. King, 87 Pa. 261; Chamberlain v. Dow, 16 W. N. 532; Gates v. Watt, 127 Pa. 20; Bigelow on Fraud, 259; Hinkley v. Wheelwright, 8 Am. L. Reg. 603; Holmes v. Grant, 8 Paige, 245; Darlington's Est., 147 Pa. 624.

The sale by plaintiff to Dr. Shamburg of her interest in their joint leasehold, having been procured by actual fraud, was void: 2 Pom. Eq. § 901; Kerr on Fraud & Mistake, 60; 1 Story's Equity, 218; Brooks v. Martin, 2 Wall. 70; Short v. Stevenson, 63 Pa. 95; Lindley on Part. 569; Bigelow on Fraud, 190.

A partnership resulted from the joint operation on the lease: Lindley on Part. * 55; Kahn v. Smelting Co., 102 U. S. 641.

Plaintiff is entitled to relief in equity: Act of April 25, 1850, P. L. 573; Ainey's Ap., 2 Penny. 193; Bentley's Est., 40 Leg. Int. 252; Miller's Est., 22 W. N. 11; Walker's Ap., 4 Penny. 452; Gandolfo v. Hood, 1 Pears. 269; Ricketts's Ap., 21 W. N. 229; Pence v. Langdon, 99 U. S. 578.

If plaintiff cannot for any reason have a decree of rescission and reconveyance, she is entitled to compensation: Fessler's Ap., 75 Pa. 503; Masson's Ap., 70 Pa. 26; Reeder v. Trullinger, 151 Pa. 287; Milkman v. Ordway, 106 Mass. 232; Ballou v. Billings, 136 Mass. 307; Pom. Eq. 1410; Kilbourn v. Sunderland, 130 U. S. 505; Adam's Ap., 113 Pa. 449; Lower's Ap., 1 Walker, 404.

Plaintiff was not bound to return or offer to return the purchase money received by her before filing her bill: McCaskey v. Graff, 23 Pa. 321; Jackson v. Summerville, 13 Pa. 370; R. R. v. Soutter, 13 Wall. 517; Rumfelt v. Clemmens, 46 Pa. 455; Bleakley's Ap., 66 Pa. 187; Ricketts's Ap., 21 W. N. 229; Phila. v. Gas Works, 12 W. N. 568; Harrison v. Church, 41 Leg. Int. 44; Rossiter's Ap., 2 Pa. 371; Rothrock v. Gallagher,

91 Pa. 108; Adams v. Edwards, 115 Pa. 211; Worrall's Ap., 110 Pa. 349.

*Julius Byles, Samuel D. Irwin* and *Eugene Mackey* with him, for appellee, cited: Mead v. Conroe, 113 Pa. 220; Bear's Est., 60 Pa. 430; Com. v. R. R., 74 Pa. 94; Williams v. Davis, 69 Pa. 21; 2 Parsons on Cont. *772; Story's Eq. Jurisp. § 203; Cooley on Torts, * 63; Graham v. Graham, 34 Pa. 475; Pollock v. Ray, 85 Pa. 428; Heffner's Est., 134 Pa. 436; Peter's Ap., 106 Pa. 340.

OPINION BY MR. JUSTICE MITCHELL, November 6, 1893:

There are two main questions of fact upon which the plaintiff's claim to relief must ultimately rest, first, serious inadequacy of price, and, secondly, fraud, actual or constructive. If either of these grounds fail, the case must fall.

The master finds that there was no inadequacy of price, and as the learned court concurs in this finding, it would be sufficient for us to say that we have not been shown that it was clear error. But an examination of the whole evidence in deference to the earnestness of counsel who regard this as a turning point in the case, leads us to the same conclusion. At the time of the sale, July 1879, the two hundred acre tract was undeveloped except for one well, No. 8, which had been in operation about three months. The most favorable evidence as to this well was given by James, who said " my recollection is that it started off between five and seven barrels somewhere," while the McIntyres, Tucker and other witnesses put its production at from one to three barrels. The same witnesses describe the neighboring territory as " spotted," good wells and dry holes being found close together. The fifty acre tract adjoining on the northwest had at that date three wells, two of which, Nos. 5 and 6, were small, and one, No. 7, was a valuable well, having produced as high as seventy-five barrels, and ranging down according to the different witnesses from that to seven or eight barrels, which James McIntyre says was its production in July, 1879. Business was dull, and there was no active market for leases in that neighborhood (Jenkins and Fogle). Under these circumstances it is plain that the value of the lease was almost entirely speculative. Indeed James testifies that the

value of oil territory is always speculative until it is actually developed. It is a business with elements of great uncertainty, and appears to have been peculiarly so in the present case. Everything depended on whether No. 7, or the little wells near it, should be taken as the best index of the nature of the territory. The three witnesses for plaintiff put the value of the lease at from twenty thousand to eight or ten thousand dollars, the highest estimate being given by Egoff, whose testimony is badly handicapped by the fact that he was a discharged employee who admitted that he had come forward in the case partly "to get even with" his former employer. On the other hand we have the testimony of eight or nine witnesses, most of them with superior local knowledge, and several owners of land in the immediate vicinity, with certainly no bias to depreciate the neighborhood, all concurring that the lease was worth nothing beyond the royalty. The decided weight of the evidence is in favor of the adequacy of the consideration paid.

As this finding takes away the foundation of the plaintiff's claim to relief, the other matters may be dismissed briefly. There was no proof of actual fraud. No express misrepresentations were shown, all that there was on the subject being the clause in the assignment of the lease stipulating a "further consideration of one hundred dollars when a well is found on said lease producing six barrels per day," etc. The master construed this as "a practical representation that no such well had then been found." In view of the fact that this is writing into a paper in which the plaintiff is the grantor, and which the grantee has not signed, a representation by the latter which is not to be found in the words used, this construction might be difficult to maintain, but, as it is in favor of the appellant, we need not consider it further. Even conceding that the representation was thus made, the master finds that it has not been shown to be untrue.

It is further claimed that Shamburg, intentionally and in bad faith, concealed from the plaintiff facts relating to the production of oil on the fifty acre lease, which she was entitled to know. It was certainly shown that Shamburg had directed his employees not to give information on this subject, but to refer parties to him. The plaintiff had no interest in the fifty acre lease, but we may concede that when she was about to sell

her part of the other lease to her cotenant she became entitled to know such facts with regard to the production of the former as would bear upon the value of the latter. But unless there is some exceptional circumstance to put on him the duty to speak, it is the right of every man to keep his business to himself. Possibly Shamburg was unduly suspicious on this point, but the nature and position of his business suggested caution. Fogle testifies that Shamburg was the only person operating in that neighborhood, and James says that Shamburg told him he had spent near one hundred and fifty thousand dollars in developing that territory, "and now all these fellows are anxious to pry into my business." We do not find in the acts of Shamburg, under the circumstances, anything more than a positive intention and effort to reap the benefit of his enterprise by keeping the knowledge of its results to himself, and we agree with the master that this "falls far short of establishing fraud."

The claim of constructive fraud is based on the relations of the parties as partners, and as mortgagor and mortgagee.

The master has rightly found that there was no partnership. The parties were tenants in common. No presumption of partnership arose from that relation, Walker v. Tupper, 152 Pa. 1; Dunham v. Loverock [reported above, page 197] and Butler Bank v. Osborne, 159 Pa. 10; and there was no evidence from which to infer a partnership by intention and agreement of the parties.

The relationship of mortgagor and mortgagee, like that of tenants in common, is, in some respects, and to a limited degree, one of confidence. There are certain things, approximating to, if not actually involving a breach of good faith, which neither will be permitted to do, to the prejudice of the other. But we do not find in the present case anything which requires the application of this principle. The mortgage was merely for indemnity against a contingent loss by having to pay a guaranty to third persons. Until such loss occurred Shamburg had no claim on the mortgaged premises which changed the relation of the parties as tenants in common.

Decree affirmed.