WALTER W. BARNEY ET AL., APPELLANTS, v. WALTER A. CHAMBERLAIN ET AL., APPELLEES.

FILED JANUARY 20, 1910. No. 15,900.

1. **Quieting Title: EQUITY.** A entered 160 acres of land in Lincoln county under the homestead laws of the United States. After acquiring title he executed a mortgage thereon for the sum of $400. In 1896, owing to the drought and a failure of crops, he removed from the property, failed to pay the mortgage or any

53

interest on the debt thereby secured, and failed to pay any taxes from the year 1895 to and including the year 1900. He never returned to the land nor saw it after his removal, neither did he seek any information as to the effect upon the title caused by his defaults. During his absence the land was sold for taxes under a void judicial sale, B, the grantee of the purchaser, taking and retaining possession under a belief that his title was perfect. In 1907, being informed that his title might be questioned, he, through an agent, discovered the original owner A, and by correspondence a contract was made by which B, the occupant of the land, was to pay $200 and receive a quitclaim deed. An unsigned deed was sent to A for execution, and with it a receipt issued by a bank and payable to his order upon delivery of the executed deed. Instead of fulfilling his contract he conveyed the land to C for the consideration of $200, and a contract for an equal division of the net profits to be realized upon the termination of the litigation to follow, and the sale of the land. C had full knowledge of the contract between A and B. Up to and pending the contract between A and B, A believed he had no title to the land, believing that he had been divested thereof by a foreclosure of the mortgage, and B believed that his title was good. A had been informed that B had a tax title to the property. At the time A left the property, and for some years thereafter, it had little, if any, market value. At the time of the negotiations and contract the value had increased from about $200 to $300 to from $2,000 to $3,200. The mortgage, though presumably barred, was unpaid, amounting at that time to about $1,000. To recover the land it would be necessary to redeem from the taxes paid by B and his grantors for the years 1895 to 1907, inclusive. *Held*, That under these circumstances the consideration of $200 for a quitclaim deed was not so small as to render the contract unconscionable, and a court of equity would enforce it.

2. ———: ———: BONA FIDE PURCHASER. *Held*, also, that C had no greater or higher equity than A would have had, and, having purchased with knowledge of B's purchase, he was bound thereby, and his suit to quiet the title must fail.

3. Vendor and Purchaser: BONA FIDE PURCHASER. "A party who purchases real estate with knowledge that another has a contract of purchase for the same is not a *bona fide* purchaser; and if he acquires such knowledge at any time before the payment of the consideration, he will not be protected as a purchaser in good faith." *Veith v. McMurtry*, 26 Neb. 341.

4. Quieting Title: PURCHASER WITH NOTICE. "If A enters into a contract to sell land to B, and without complying with the contract sells the land to C, B may compel the purchaser to convey to

him, provided he is chargeable with notice at the time of his purchase of B's equitable title under the agreement." *Veith v. McMurtry*, 26 Neb. 341.

5. ——: ——. "A purchaser with notice is liable to the same equity, stands in his place, and is bound to do that which the person he represents would be bound to do by the decree. He takes the estate subject to the charge, and stands in the place of his vendor." *Veith v. McMurtry*, 26 Neb. 341.

6. ——: MORTGAGES: EQUITY. The title to real estate will not be quieted as against an unpaid mortgage, though apparently barred by limitation, without the payment or tender of the amount of the mortgage, with legal interest.

APPEAL from the district court for Lincoln county: HANSON M. GRIMES, JUDGE. *Affirmed as modified.*

*N. P. McDonald,* for appellants.

*Hoagland & Hoagland* and *George E. French, contra.*

REESE, C. J.

This action was commenced in the district court for Lincoln county for the purpose of quieting title to a tract of land described as the northeast quarter of section 11, township 9, range 34, in said county. The pleadings are quite voluminous, and will be stated here only so far as to give an epitome of what are deemed the essential averments.

The plaintiff alleges that he is the owner in fee and entitled to the immediate possession of the real estate above described; that on November 4, 1901, the defendant, the county of Lincoln, commenced an action in the district court for said county against George Calvin and wife, and others not necessary to be mentioned here, for the purpose of foreclosing a tax lien against the land for the taxes thereon for the years 1895 to 1900, inclusive; that service of summons was had on all the defendants in the action by publication alone, and none of them appeared therein; that a decree was rendered against all, declaring a lien for the sum of $85 taxes, and $32.98 costs, and or-

dering the land to be sold for the satisfaction of the same; that, pursuant to the said order and decree, an order of sale was issued, and the land was sold at public sale to Lincoln county, the sale confirmed, and deed made by the sheriff, bearing date July 21, 1902, which deed the county had caused to be recorded; that on November 6, 1903, the county commissioners conveyed the property to the defendant, W. A. Chamberlain, who went into possession thereof and retained the same and was in possession at the time of the commencement of this suit; that George Calvin became the owner of said property in the month of June, 1890, and continued to be such owner until the 3d day of August, 1907, when he sold and conveyed it to plaintiff; that at all times during the pendency of the suit to foreclose the tax lien the said Calvin was and has continued to be a resident of this state, his whereabouts being well known, and that no service of summons was ever made upon him, nor upon his wife, and that he had no knowledge of the pendency of the action until a short time before his conveyance to plaintiff Barney, and the commencement of this suit; that said foreclosure proceedings were had without any administrative sale of the property, and the county, at and before the commencement thereof, was not the holder of any tax sale certificates issued by the county treasurer in pursuance of any such sale; that the court by such publication of notice acquired no jurisdiction over him, nor his wife, and that the whole of said proceeding was null and void, and no title was thereby acquired by the county, and the conveyance by the county commissioners to Chamberlain was without authority, and vested no title in him; that on the first day of June, 1890, said Calvin executed a mortgage to Julia A. Thayer, but that said mortgage had become barred by the statute of limitations and constituted no lien on the premises. This is followed by an offer to redeem by paying all taxes, assessments, interest and costs thereon, including the taxes for which the foreclosure was brought, with prayer for an accounting and quieting title.

The amended answer of defendant Chamberlain admits such averments of the petition as are shown of record, consisting of the former ownership of Calvin, the foreclosure for taxes, his purchase, etc., and denies the other allegations, and specifically denies that plaintiff has, or that Calvin had, any interest in or title to the property at the time of the execution of the deed to plaintiff. It is alleged, by a cross-petition as against Julia A. Thayer, that the mortgage to her is barred by the statute of limitations, and also that it was barred by the foreclosure proceedings, and that it is extinguished, but casts a cloud upon defendant's title. As a cross-petition as against plaintiff and the Calvins, the foreclosure proceedings throughout are pleaded, which it is alleged terminated in the vesting of the title in Lincoln county, and the purchase by and conveyance to defendant vested the title to the property in him; that upon the purchase of said land he, on the 6th day of November, 1903, entered into the possession thereof, and held and still holds said possession. It is further alleged that, after his purchase and possession, some question arose as to the sufficiency of his title, and he engaged and employed one O. E. Elder, a real estate dealer of North Platte, to negotiate with and purchase from the Calvins whatever equity they might have in the premises, and that by correspondence, which is set out in the cross-petition, the said equity was by direction and approval of defendant purchased for the sum of $200, the defendant being in possession and claiming title to the property; that in pursuance of said contract of purchase defendant had deposited the price in a bank, and forwarded a deed to the Calvins for execution; that the deed was received and accepted by them, and they proceeded to execute it on a date named by them, but in violation of their contract, and with full knowledge of the same and of defendant's possession and claim of title, the plaintiff entered into a collusive and fraudulent agreement with them whereby the plaintiff was to receive and did receive the conveyance to himself, and caused it to be recorded

in the deed records of Lincoln county. The prayer is for a decree dismissing plaintiff's suit, canceling his deed, and quieting title to the property in defendant, and requiring the execution of a quitclaim deed to defendant by the Calvins. The prayer further asks for the cancelation of the mortgage held by Julia A. Thayer, and executed by the Calvins.

The Calvins also filed an answer to defendant's cross-petition, in which they admit the averments of plaintiff's petition, and deny those of defendant's answer and cross-petition not admitted. They admit the former ownership of the land, but allege that at the time of the foreclosure proceedings they were residents of Buffalo county, in this state, and had so continued to be since said time, and therefore said proceedings were void; that at the time they removed from the land, in 1896, it had practically no market value, and at the time of the alleged contract they had no knowledge of the changed conditions and increase in the value of the land, but at that time the property was worth $3,200, of which defendant had full knowledge; that at the time of the acceptance of defendant's offer of $200 they presumed, and took it for granted, that they had in some way been deprived of the title by force of the Thayer mortgage, not knowing that it had not been foreclosed, or that it was barred by the statute of limitations, neither had they knowledge of the exact nature of defendant's title, nor of the foreclosure proceedings, or that they were void, but that they were under the misapprehension that they had lost the title, and under these conditions the contract was made; that defendant had full knowledge of the facts, and the contract was obtained in fraud of plaintiff's rights; that the enforcement of said contract would be unjust, inequitable, and unconscionable. The prayer is similar to that contained in plaintiff's petition. The reply of plaintiff contains the usual denial, and averment of facts similar to those contained in the answer and cross-petition of the Calvins. The county of Lincoln filed an answer to the petition, but it is not deemed necessary

to notice it further.   Defendant replied to the answer and
cross-petition of the Calvins, questioning its legal suffi-
ciency, and also denying its allegations.   It is not deemed
necessary to notice the many motions and demurrers filed,
as their consideration is not essential.   Upon a trial be-
ing had, the court found specially upon all the issues in
the case, but at too great length to be here set out, even
in a condensed form.   The history of the case is stated at
length, all controverted questions being found in favor of
defendant Chamberlain.

The findings of fact and evidence show, without ques-
tion by either party, that Calvin homesteaded the land,
made the necessary proof, and obtained a patent.   He
soon thereafter executed a mortgage for $400, which now
belongs to Julia A. Thayer, so far as the records show.
In 1896 he left the property, and has never returned to it,
nor has he paid the mortgage or any of the taxes.   With
the exception of about one month he has resided in this
state, has kept up correspondence with those living near
the land, but made no effort to protect his interest therein.
He assigned as his reason for leaving the land that they
were "starved out," owing to the dry weather and failure
of crops.   In the year 1901 the county began its suit to
foreclose the tax liens on the land for the years 1895 to
1900, inclusive, but without any previous administrative
sale, giving notice by publication, and in no other manner.
In April, 1902, a decree was rendered, finding the amount
of taxes due to be $85.76, and costs $32.98.   An order of
sale was issued May 6, 1902, and the land was sold to
Lincoln county for $134.   The sale was subsequently con-
firmed, and sheriff's deed made to the county.   On Novem-
ber 6, 1903, the county, by its commissioners, conveyed
the land to defendant for the consideration of $142.49; he
taking possession.   At that time the land had practically
no market value.   The fact of the foreclosure was not
known to Calvin at that time, nor until about the time of
his conveyance to plaintiff about the 3d day of August,
1907, although he had been informed that defendant had

bought the property at tax sale. The fact that the fore-closure proceedings were void was not known to defend-ant until after that time. Calvin believed he had lost the land, the loss growing out of the mortgage lien which he had put on it in 1890, and on which he had paid nothing, the debt secured by it having become due in 1895. While in the possession of the land, defendant had paid the taxes as they matured for the years 1901 to 1907, inclusive, be-lieving that his title was good. In 1907, hearing that some question had been raised as to titles in that part of the state, he applied to Mr. Elder, who was dealing in real estate and preparing abstracts of titles, to investigate the matter of his title, and who, upon examination, concluded and informed defendant that his title was probably good, but that the mortgage might give him trouble. Defendant then authorized Elder to find and negotiate with the hold-ers of what might be outstanding interests, with a view of fortifying his title. Elder succeeded in locating Calvin, and wrote him asking what he would take for a quitclaim deed. On the 4th day of June, 1907, Calvin responded as follows: "Yours of recent date at hand, and in regard to that land I will take $200 to give a quitclaim deed. I was away from home when your letter came or I would have wrote sooner. Write soon as you get this and let me know." June 10 Elder answered that as soon as he could hear from the parties he would let Calvin know. June 16 he wrote Calvin, inclosing a quitclaim deed for execution, and saying that he had deposited the $200 in the First National Bank of North Platte, with instruc-tions to send the money to Calvin on receipt of the deed properly executed. July 11 Calvin wrote Elder that he had been absent, was ready to make the deed, but sug-gested that the money be sent to the Ravenna State Bank, and asking Elder to write him letting him know what to do. He closed the letter with a postscript, saying: "I will make out the deed next week soon as I hear from you." July 13 Elder responded that he would have no objection to sending the money as suggested, but that he

had left it with the bank to be paid to Calvin, and had taken a receipt for it showing the money to be there subject to Calvin's order, and inclosed the receipt. July 18 Calvin wrote Elder: "Your letter at hand and will get deed fixed up Sat. the 20 and send it. I am very busy now harvesting and don't want to stop until I get done." About this time Calvin went to the office of plaintiff, and, as plaintiff testified, "to execute a deed that he had received from Mr. Elder. He said before he had received the deed he had received a letter from one of his neighbors near Wallace, where he used to live, telling him that the land was worth $20 an acre now, and that Mr. Chamberlain was claiming to own this land, that he had got title from a tax deed." It fully appears that plaintiff knew of the transaction between Calvin and defendant; that he suggested that before making the deed an abstract of title should be procured and the condition of the title investigated. It was agreed that he should obtain an abstract, and the Calvins left his office. The abstract was secured, and in about a week after their first visit Calvin returned. He seemed to be afraid of the effect of the sheriff's deed, needed the money, and thought he would better take the $200 then in the bank for him. We quote the following from plaintiff's testimony: "After I received the abstract Mr. Calvin came into my office, and I told him what the abstract disclosed—that there was no service upon him as he had said. I says, 'The title is no good.' I says, 'The land is worth more money.' I says, 'You ought to get more money.' He says, 'I want to get more money for it if I can.' I says, 'You ought not to sell it for any such sum.' He says, 'There is that sheriff's deed, I think I had better take the $200.' I says, 'You do not have to take the $200 from Mr. Chamberlain.' I says, 'I will tell you what I will do,' I says, 'if you need $200 in money right now, I will give you $200 cash, and I will give you one-half of all I can sell the land for over and above that.' He says, 'That is a fair proposition, I will make that deal with you.' In carrying out that

agreement he gave me a warranty deed for the property." A written contract was then entered into containing this agreement, and the Calvins executed a warranty deed to plaintiff, and returned to Elder the quitclaim deed unexecuted, also the bank's receipt for the $200. By this it appears that plaintiff made the purchase with his eyes open, and with full knowledge of Calvin's sale to defendant, and that he can have no higher or better right than Calvin would have had, if as good.

Plaintiff's princ'pal contention, with reference to the contract between defendant and Calvin, is that there was such a great difference between the contract price of $200 and the value of the land, which the district court found to be from $2,000 to $3,200, that it would be unconscionable and against equity to enforce it, but for that reason the contract is and would be valid and enforceable. This is the main question presented. It must be admitted that, ordinarily, the position of plaintiff is correct, and, had the agreement been for the conveyance of a clear title to the property for this inadequate consideration, the court would probably refuse to assent to the decree. But that is not this case. The unpaid mortgage, though barred, was standing against the land for the sum of about $1,000, and which could not be removed as a cloud upon the title without payment. *Merriam v. Goodlett,* 36 Neb. 384. So far as appears from this record, it may be unenforceable, but it cannot be removed without payment. Calvin had practically abandoned the property in 1896, and neither he nor his family had ever returned to it or seen it after that time. He had not paid, nor attempted to pay, either the taxes or the mortgage. He supposed that his title had been extinguished. To use his own expression upon the witness stand: "I did not believe I had any title." Defendant in possession thought his title was unassailable by Calvin. There is no claim that he was guilty of any fraud, either by suppression or suggestion. He was willing to pay the $200 to prevent his title being questioned, and Calvin was willing to ac-

cept that sum and give a quitclaim deed to that which he thought he did not own. Calvin made no effort to inform himself, but, acting upon his own judgment, entered into the contract. Whether he could get any more than the $200 by dealing with plaintiff would necessarily depend upon plaintiff's success in asserting his title in a lawsuit, his success in obtaining by sale more than the $200 and all expenses, including attorney's fees and costs, and the honesty and integrity of plaintiff in reporting results after all was completed. At the suggestion and solicitation of plaintiff he consented to repudiate his contract with defendant and take his chance with plaintiff. There were no fiduciary relations existing between him and defendant. They dealt with each other at arm's length. Had defendant supposed that his title could be successfully assailed in a lawsuit he was under no legal obligation to inform Calvin. *Files v. Brown,* 59 C. C. A. 403, 124 Fed. 133. As both understood it, and as was the fact, he was selling to plaintiff his chance or possibility of succeeding in a lawsuit in which, if successful, he would have to repay to defendant the taxes paid, with interest, with the mortgage still standing against the land, and the possibility of said mortgage being enforced, for he well knew he had not paid it or any part of it. "In reference to such contracts, the element of *risk* or *hazard* is such a disturbing element in the estimation of value, that courts of equity, when inadequacy (of consideration) alone is in question, will refuse to interfere." *Pennybacker v. Laidley,* 33 W. Va. 624, 11 S. E. 39.

As we have suggested, plaintiff is certainly in no better condition than Calvin would have been had he pursued the course adopted by plaintiff. He purchased with knowledge of Calvin's contract, and therefore he is not a *bona fide* purchaser, and can be required to convey to defendant, or his deed be canceled. *Veith v. McMurtry,* 26 Neb. 341. As between plaintiff and defendant Chamberlain, the decree of the district court is right, and is affirmed. But that portion canceling the Thayer mort-

gage should not have been entered, and cannot be approved. The holder of the mortgage made no appearance, and has not appealed, and we know of no rule of law or equity by which such a decree could be entered without the party being required to redeem by the payment of the debt with legal interest. The decree must be modified to the extent of reversing that portion. As modified, it is affirmed.

AFFIRMED AS MODIFIED.